Larry Zerner (SBN 155473)
Law Offices of Larry Zerner
1801 Century Park East, Ste. 2400
Los Angeles, CA 90067
(310) 773-3623
Email: Larry@ZernerLaw.com

Attorney for Plaintiff Phoenix Entertainment Partners, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHOENIX ENTERTAINMENT PARTNERS, LLC,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>THE MINERVA GROUP, INC. dba REMS VEGAS SPORTS LOUNGE, and DOES 1-10, inclusive<br><br>　　　　　Defendants | Case No.: 8:16-cv-1417<br><br>COMPLAINT<br><br>REQUEST FOR JURY TRIAL<br>(F.R.C.P. Rule 38) |

　　　The Plaintiff, Phoenix Entertainment Partners, LLC ("PEP"), by its undersigned counsel, hereby complains of Defendant The Minerva Group, Inc. d/b/a Rems Vegas Sports Lounge ("Minerva") and Does 1 to 10 and for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1. This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2. This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3. This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Defendant Minerva's principal place of business is located in the State of California and the United States District Court for the Central District of California and transacts business in the State of California and the United States District Court for the Central District of California.

5. This Court has personal jurisdiction over each Defendant, in that Defendants are located in this State and federal judicial district and all Defendants conduct significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6. Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7. Upon information and belief, Defendant the Minerva Group, Inc. is a

California corporation, and is the operator of a bar and restaurant called "Rems Vegas Sports Lounge" in Placentia, CA.  The Rems Vegas Sports Lounge regularly provides Karaoke entertainment to its customers.

## BACKGROUND FACTS

8. Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

9. The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

10. Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

11. Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

12. The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

13. PEP is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

14. PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand, including all trademark rights in SOUND CHOICE.

15. Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

16. SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers. According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

17. The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

18. SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

19. Slep-Tone and its successor PEP have released their karaoke tracks for commercial users only on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

20. Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

21. In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

22.  In a typical bar or restaurant environment, because the imitation tracks still bear the SOUND CHOICE trademarks and use the protectable trade dress, when the tracks are used, the SOUND CHOICE trademarks and trade dress are broadcast, published, and advertised to the general public or specific market segment to advertise the establishment's goods, products or services for the purpose of attracting customers or supporters. As a result, the bar or restaurant infringes the trademarks and trade dress when it advertises and promotes karaoke services which infringe the trademarks and trade dress.

23.  The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

24.  Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

25.  Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

26.  Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

27.  In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

Complaint

28. That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

29. That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

30. For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

31. The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

32. The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

33. Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

34. This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

35. Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

36. None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

37. Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

### THE RIGHTS OF THE PLAINTIFF

38. PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

39. PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

40. PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

41. PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in paragraph 43, for "conducting entertainment exhibitions in the nature of karaoke shows."

42. PEP and its predecessor have, for the entire time its marks identified above

Complaint

("the SOUND CHOICE Marks") have been federally registered, provided the public, including the Defendants with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

43. PEP is the owner of California Trademark Registration No. 115195, issued August 8, 2013, for a display trademark as follows:



for "Compact Disc plus graphics (CD+G); karaoke/DVD multi-format player" in class 9.

44. PEP is the owner of California Trademark Registration No. 68690, issued August 8, 2013, for a display trademark as follows:



for "Compact Disc plus graphics (CD+G); karaoke/DVD multi-format player" in class 41.

45. PEP is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress"). This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the SOUND CHOICE Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

46. PEP and its predecessor-in-interest have used its trade dress continuously and substantially exclusively for a period of decades.

47. The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

48. The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by Minerva are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the SOUND CHOICE Marks are also displayed.

49. The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

50. No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF DEFENDANT MINERVA

51. Upon information and belief, Minerva regularly hires karaoke operators to provide commercial karaoke services at the Rems Vegas Sports Lounge.

52. Minerva has the right and ability to control whether its karaoke operators use authentic or counterfeit materials to provide services.

53. On or about November 18, 2015, PEP or its representatives informed Minerva by letter that the contractors providing karaoke services at its venue were using infringing and counterfeit karaoke accompaniment tracks. The letter offered Minerva the opportunity to enter into PEP's Verified Compliance Safe Harbor Program, which is a free program that protects venues from liability for the acts of its contractors in exchange for requiring its karaoke operators to provide information about their karaoke systems to enable PEP to assess whether those

karaoke operators are operating legally.

54. PEP also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

55. As a result of PEP's efforts, Minerva has actual knowledge of the infringing and counterfeit nature of karaoke materials used by its karaoke operators.

56. Despite that knowledge, Minerva continued to hire karaoke operators who used infringing and counterfeit karaoke materials.

57. Despite that knowledge, Minerva continued to receive a financial benefit from the provision of infringing karaoke services at their establishment by the karaoke operators through the attraction of paying patrons to their establishment.

58. The availability of karaoke shows has been advertised at Minerva's facility and, through the display of the Sound Choice Marks while the services were being provided, falsely advertised its use of genuine Sound Choice karaoke tracks.

59. Minerva is liable for the acts of trademark infringement directly engaged in by the karaoke operators on their respective premises or for their benefit.

## FIRST CLAIM FOR RELIEF
## TRADEMARK AND TRADE DRESS INFRINGEMENT
## AGAINST ALL DEFENDANTS

60. PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

61. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND

CHOICE Marks or the Trade Dress, and/or by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

62. Defendant's use of the SOUND CHOICE Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

63. PEP did not license any of the Defendants to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided at their venue(s).

64. Use of the SOUND CHOICE Marks in the manner attributable to Defendants is likely to cause confusion, or to cause mistake, or to deceive Defendants' customers into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

65. Defendants' acts were willful and knowing.

66. PEP has been damaged by infringing activities of Defendants.

67. Unless enjoined by the Court, Defendants' infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
## AGAINST ALL DEFENDANTS

68. PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

69. On each occasion when Defendants caused or permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Defendants caused or permitted the display of the SOUND CHOICE Marks in

connection with karaoke entertainment services.

70. The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Defendant's services and commercial activities.

71. The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP for use in providing karaoke entertainment services.

72. Defendants' use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Defendants had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

73. Because PEP has been denied this revenue, it has been damaged by Defendants' uses.

74. On each occasion when Defendants displayed an accompaniment track pirated from another manufacturer to be played during a karaoke show, Defendants caused the display of the words, names, and symbols of the other manufacturer in connection with Defendants' karaoke services.

75. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Defendants acquired in a legitimate manner.

76. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in

that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Defendants.

77. Defendants' use of the false designations of origin in this fashion damages PEP by enabling Defendants to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

78. The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

79. Because PEP has been denied this revenue, it has been damaged by Defendants' false designations of origin relating to other manufacturers.

80. Unless enjoined by the Court, Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

## THIRD CLAIM FOR RELIEF
## CALIFORNIA DECEPTIVE TRADE PRACTICES ACT
## AGAINST ALL DEFENDANTS

81. PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

82. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

83. Defendants' acts of infringement occurred during the conduct of trade or commerce, from which Defendants derived an economic benefit.

84. Defendants' acts of infringement constitute unfair or deceptive acts or practices within the meaning of California Bus. & Prof. Code §17200, et seq.

85. Defendants' acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

86. As a direct and proximate result of each of Defendants' acts of infringement PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Defendants' acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

87. As such, PEP has been damaged and is likely to be further damaged by a deceptive trade practice of Defendants' within the meaning of California Bus. & Prof. Code §17200, et seq. Unless enjoined by the Court, Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

## FOURTH CLAIM FOR RELIEF
## COMMON LAW UNFAIR COMPETITION
## AGAINST ALL DEFENDANTS

88. PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

89. Defendants' used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND

CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

90. Defendants' use of the SOUND CHOICE Marks was "in commerce" within the meaning ascribed by California common law.

91. PEP did not license Defendants' to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided to its commercial establishments.

92. Use of the SOUND CHOICE Marks in the manner attributable to Defendants is likely to cause confusion, or to cause mistake, or to deceive customers at Defendants venues into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

93. Defendants' acts were willful and knowing.

94. PEP has been damaged by infringing activities of Defendants'.

95. Unless enjoined by the Court, Defendants' infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PEP prays that the Court:

A. Find that Minerva and Does 1 to 10 committed acts of infringement, including but not limited to counterfeiting, of the federally registered SOUND CHOICE Marks and of the Trade Dress;

B. Find that Minerva and Does 1 to 10 engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C. Enter judgment against Minerva and Does 1 to 10 in favor of PEP on all applicable counts;

D. Find the activities of Minerva and Does 1 to 10 were in all respects

conducted willfully and for profit;

E.    Award to PEP the damages sustained by PEP because of the conduct of Minerva and Does 1 to 10 in infringing the SOUND CHOICE Marks, the SOUND CHOICE Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

F.    Award to PEP the profits of Minerva and Does 1 to 10 because of Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

G.    Award to PEP treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $100,000 from each of the Defendants;

H.    Grant PEP injunctive relief against further infringement of the SOUND CHOICE Marks by Minerva and Does 1 to 10;

I.    Award PEP its costs, suit and attorney fees, to the extent not awarded above; and

J.    Grant PEP such other and further relief as justice may require.

DATED: August 1, 2016    LAW OFFICES OF LARRY ZERNER

By: <u>Larry Zerner</u>_____
    Larry Zerner
    Attorney for Plaintiff
    Phoenix Entertainment Partners, LLC

## DEMAND FOR TRIAL BY JURY

Plaintiff Phoenix Entertainment Partners, LLC pursuant to Rule 38 of the Federal Rules of Civil Procedure hereby demands trial by jury of all issues so triable in the present action.

DATED: August 1, 2016　　　　　　　　LAW OFFICES OF LARRY ZERNER

　　　　　　　　　　　　　　　　　　By: <u>Larry Zerner</u>_____
　　　　　　　　　　　　　　　　　　　　 Larry Zerner
　　　　　　　　　　　　　　　　　　　　 Attorney for Plaintiff
　　　　　　　　　　　　　　　　　　　　 Phoenix Entertainment Partners, LLC

**Complaint**